**SCOTT E. BRADFORD, OSB #062824**
United States Attorney
District of Oregon
**JAMES A. KILCUP, OSB #173891**
**ARIANA N. GAROUSI, CAB #347758**
Assistant United States Attorneys
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2936
James.Kilcup@usdoj.gov
Ariana.Garousi@usdoj.gov
Telephone:    (503) 727-1000
        Attorneys for United States

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

JACK MATTHEW HOGAN,

        Plaintiff,

v.

UNITED STATES OF AMERICA,

        Defendant/Third-Party
        Plaintiff

v.

HARNEY COUNTY, OREGON,

        Third-Party Defendant/
        Third-Party Plaintiff

v.

AIDA M. GOMA PETIT,

        Third-Party Defendant.

Case No. 3:23-cv-00765-AB

**UNITED STATES' RESPONSE TO PLAINTIFF'S MOTION FOR RULE 37 SANCTIONS**

**<u>INTRODUCTION</u>**

Requests for sanctions are serious, especially when the requested sanctions are based on an allegation that a party violated a court order. Here, Plaintiff claims that the United States violated an order of this Court and asks this Court to order the "ultimate" sanction: victory on the merits of Phase 1 of trial. While Plaintiff couches his requested sanction as an order for a mere "established fact," the fact Plaintiff asks the Court to establish—"the subject cattleguard is federal property"—would, in Plaintiff's view, require the denial of the United States' jurisdictional defense.

When a party comes to the Court with a weighty allegation of misconduct and in search of a remedy that would dispose of the opposing party's threshold defense, one would expect such a claim to be strongly supported in the factual record and the request to be well grounded in legal authority. Here, Plaintiff has no factual support for its allegation and no legal support for its requested remedy. For the following reasons, the Court should deny Plaintiff's motion.

*First*, the United States did not violate an order from this Court. To create the appearance of such a violation, Plaintiff takes language from a submission filed by Plaintiff's counsel—ECF 101[1]—that describes a discovery agreement reached between the parties, and characterizes the parties' language as "this Court's January 27, 2025 Discovery Order." ECF 160 at 2. Plaintiff's motion in fact refers to that filing as "the Court's Discovery Order" five different times. *See id*. at 2, 7, 9. Plaintiff does so despite the fact that the language he relies on from ECF 101 as this Court's "order" does not reflect anything said by the Court and does not bear the Court's signature. Worse still, Plaintiff does so even though, in ECF 102, the Court expressly construed ECF 101 as a "motion" and proceeded to enter its actual "order."

---

[1] In full, Stipulated Proposed Form of Order Submitted re Discovery, signed by counsel for Plaintiff and the United States.

**Page 1**       **UNITED STATES' RESPONSE TO PLAINTIFF'S MOTION FOR RULE 37 SANCTIONS**

This is fatal to Plaintiff's claim. Entitlement to any sanction under Fed. R. Civ. P. 37(b)(2)(A) requires, first of all, the failure of a party "to obey an order to provide or permit discovery[.]"

*Second*, even if the agreement between the parties reflected in ECF 101 were an order of this Court, the United States in fact abided by that agreement. At the January 15, 2025, status conference, the Court ordered the parties to confer regarding a process for Plaintiff's counsel to perform an in-person inspection of documents at the Burns District Office. Plaintiff declined to do so. *See* ECF 101 at 2. Instead, the United States made additional documents available to Plaintiff through five supplemental productions between January 31, 2025, and April 15, 2025. Following those productions, Plaintiff did not seek additional relief from this Court.

The fact that a document was subsequently found and produced does not show that the United States violated its agreement. The annotated map produced by the United States in May 2026 was not located at the Burns District Office and was not within any of the seven categories of files identified by the United States at the January 15, 2025, status conference. It was held on a private drive accessible to fewer than 10 people in BLM's Oregon/Washington Cadastral Survey program.

*Third*, and relatedly, Plaintiff cannot show—and does not attempt to show—that the United States engaged in bad faith conduct.  Far from the United States engaging in bad faith discovery practices, the record shows the United States did the right thing. When it learned of a relevant document that had not been produced, it promptly produced that document to Plaintiff. And when the United States produced the document, it provided Plaintiff with assurances that the United States acknowledged the automatic limitation imposed on the document by Rule 37—that the United States could not rely on map without establishing that its prior failure to produce the

**Page 2**      **UNITED STATES' RESPONSE TO PLAINTIFF'S MOTION FOR RULE 37 SANCTIONS**

document was "substantially justified or harmless." Fed. R. Civ. P. 37(c)(1).

Because a finding of bad faith is required for a Rule 37(b)(2)(a) sanction, particularly when the sanction sought is effectively the disposition of Phase 1 in Plaintiff's favor, Plaintiff's failure to show bad faith by the United States is dispositive of its motion.

*Fourth*, Plaintiff fails to show that the production of the annotated map in May 2026 has caused him serious prejudice. The 1935 Metsker map had previously been produced to Plaintiff along with the United States' expert report. The only "new" aspect of the United States May 2026 production was a version of the map with annotations. Plaintiff is free to use that map and its annotations at trial. His experts will have had nearly three weeks to analyze the two annotation sentences before they provide this Court with their testimony. And if Plaintiff believes additional discovery on the meaning of the annotations is critical to their case, the United States does not object to continuing Phase 1 to permit Plaintiff to pursue that path.

\*    \*    \*

Whatever motivated Plaintiff's eleventh-hour effort to win Phase 1 through a discovery sanctions motion, it was not a faithful recollection of the past conduct of the parties or the Court. It was also not motivated by a strong legal basis for the requested relief—Plaintiff in fact cites no case law in support of its requested sanctions outside of its recantation of general legal standards. Plaintiff's motion should be denied.

## BACKGROUND

From February 2024 through March 2026, the United States has made over a dozen separate document productions spanning nearly 4,000 pages. On December 4, 2024, Plaintiff filed, in addition to other discovery-related motions, his first and only motion to compel discovery from the United States. ECF 79. The United States responded, questioning the relevance of the discovery

Page 3    UNITED STATES' RESPONSE TO PLAINTIFF'S MOTION FOR RULE 37 SANCTIONS

sought by Plaintiff into the history of East Steens Road and explaining the discovery it had produced to date. ECF 86.

*Hearing on Plaintiff's motion to compel*. On January 15, 2025, the Court held a telephonic status conference to address three pending motions filed by Plaintiff Jack Hogan ("Hogan") regarding discovery issues, including Plaintiff's motion to compel discovery. During the status conference, the United States provided an inventory of seven categories of BLM documents it was aware of relating to the East Steens Road:

> MR. HICKMAN: There are seven categories of files related to each of the grazing allotments around this road and I'll go through each of the seven. These -- the names of these files, the nomenclature that BLM uses is not necessarily matching up with the wording that the requests for production use, but -- but I just want to lay it all out and -- so we can discuss what's there. **The first category is called range files.** There are range files for each of the grazing allotments and those are what you might call master files. They have an allotment management plan. There are also meeting records and notes of interactions with stakeholders and customers in there. We have produced all those files.
>
> **The second category of files is called case files**, and those have all the grazing permits, leases, billing information, and those have also been produced.
>
> **The third category are called project files**, and each -- each improvement on a range -- and an improvement could be a cattle guard, it could be a -- it could be a trough or a well, it could be really anything that's been constructed on an allotment -- has a project file. And after the depositions in October, we did go back and look for the project files that Mr. Corson wanted and we have now produced the project files for the fencing in the area of the accident site.
>
> THE COURT: When did you -- I'm sorry. When did you do that?
>
> MR. HICKMAN: We -- after this issue came up at the depositions in October, we went back and we looked and we found these project files had not been produced.
>
> THE COURT: But is it correct, Mr. Hickman, you knew the issue here was the maintenance and the installation of the cattle guard on this road? Right?
>
> MR. HICKMAN: Yes.
>
> THE COURT: And if I'm understanding your description of project files, that's what documents each improvement, including cattle guard. But you didn't provide that to the plaintiff until December?

**Page 4**    **UNITED STATES' RESPONSE TO PLAINTIFF'S MOTION FOR RULE 37 SANCTIONS**

MR. HICKMAN: Yes. I did not realize that those files existed until we were in person in October in Burns. Unfortunately, this is a very remote office and we have no legal staff there. So we were working with our interior counsel (indiscernible) in Denver and working over the phone to retrieve things throughout the year, but, unfortunately, we just didn't -- we didn't realize that those files existed until we arrived ourselves in Burns in October.

THE COURT: And since I have not seen them, the project file that relates to the cattle guard at issue in this case, are you telling me there is a project file to describe and document relevant improvements of that particular place on the road and the cattle guard installed on the road?

MR. HICKMAN: No. There is -- as far as I know, there is no project file for that cattle guard.

THE COURT: Okay. Go ahead.

MR. HICKMAN: But with respect to these project files, we -- we produced the project files that are identified for range improvements on the maps that are in our response to the motion to compel. That's within a -- you know, a several-mile radius of the accident site. I talked to our BLM colleagues about this, and they've informed me that there are just hundreds of project files for any given allotment and these allotments are quite large and go way beyond the accident site. Just for the production that we made for the range improvements right around the accident site, BLM personnel had to spend about a week, two people had to spent about a week to scan in all those documents. A lot of them are very old and there are old paperclips and staples and things, and so they had to work through all that.

There are still probably hundreds of other project files for range improvements going way beyond the accident area. We could make those available for inspection in Burns, but it just seems that to -- you know, to have to put our people through potentially another -- you know, at least another week, they have to scan all that stuff, would be over burdensome.

[ … ]

**Category 4 are what are called utilization files.** Those are vegetation assessments where BLM personnel go out to the pastures and they look at how much grass the cattle have been consuming, how the other plants and forage are faring, and these go quite a ways back. So we have not -- because of the scanning logistics, we have not produced those.

**Category number 5 are what are called actual use files**. That's where permittees for grazing their cattle on the land basically file sheets that say we turned out so many heads of cattle on X pasture and we had them turned out for a certain number of weeks.

**Category 6 is what are called rangeland health files**. This, again, really relates

**Page 5**        **UNITED STATES' RESPONSE TO PLAINTIFF'S MOTION FOR RULE 37 SANCTIONS**

> to the vegetation management. Range management specialists and biologists then go out on five-year cycles and do assessments on the health of the land and the ecosystem and how that's -- how that's doing in light of the grazing activities.
>
> **The final category, number 7, are lawsuit files**, and those, I understand, are quite -- go back quite a ways and are quite voluminous. They largely involve appeals of BLM decisions to probably -- to not allow permittees or lessees to do certain activities on grazing -- on the grazing allotments.

Kilcup Decl., Ex. A at 14–18 (emphases added). In response, Hogan's counsel offered to take the United States up on its offer for an inspection at BLM's District Office in Burns, Oregon. *See id*. at 20 ("So if he wants me to show up, I'll be there … I can be there a week from Monday 8:00 a.m., in Burns to look at these files if they think that's helpful.").

The Court responded with concerns about the breadth of Hogan's requests: "[A]s I said at the beginning of the hearing, I'm not sure that I really understand your—what you refer to as specific document requests. These seem pretty broad to me." *Id*. at 22.

The Court attempted to better understand what specifically Plaintiff was seeking, and ultimately asked "Mr. Corson, if you were to take Mr. Hickman up on his offer to make available for inspection in Burns these – these project files, would that address your concern here, sir, so that you can look yourself at the documents that are available? *Id.* at 33. Plaintiff's counsel responded: "It would help me a lot to go and take a look at the documents, assuming they were all made available to me when I showed up." *Id.* at 34. Plaintiff's counsel also expressed concern with being provided irrelevant documents. *Id.* at 36 ("What I don't want to do is to be given a dump-truck load of documents that we did not ask for.").

The Court asked the United States if it would work to accommodate that concern. *Id.* The United States committed to doing so:

> I certainly have no desire to dump irrelevant stuff. And, frankly, it serves us no purpose either. It's just a lot of work for our folks that wouldn't be necessary. As the Court observed, these document requests are quite broad and detailed, and so the reason I set forth these seven categories today is to make sure we're all –

**Page 6**        **UNITED STATES' RESPONSE TO PLAINTIFF'S MOTION FOR RULE 37 SANCTIONS**

everybody understands what is there. So my vision is that even if we're a little – if we cover it a little more than we need to, I think our folks in Burns would probably just pull out these files and they're going to be in some sort of organized manner and they will be labeled and Mr. Corson can see what he wants to – what is of interest to him,"

*Id.* at 37.

The Court responded: "Why don't we start with that, Mr. Corson?" *Id*. Mr. Corson responded "Okay." *Id*. And the Court ordered as follows: "So I'm going to direct the parties to confer on an order to address Mr. Corson's in-person access to the files that he has requested production of." *Id*.

After the hearing, the Court entered a minute order stating, in relevant part: "As stated on the record, Plaintiff's . . . Motion to Compel Document Discovery from Defendant 79 [is] … **GRANTED in part**[.] ECF 101 (emphasis added).

**Post-status conference discovery.** Following the status conference, the parties conferred regarding a joint stipulated order. Rather than pursue the plan of having Plaintiff's counsel inspect BLM's district office in Burns, the parties reached an agreement that was reflected in a Stipulated Proposed Form of Order Submitted re Discovery and filed by Plaintiff's counsel. ECF 101. Regarding document discovery, the parties reported the following:

> The Court directed counsel for Plaintiff and Defendant to confer further about details of discovery needed at this time, and they have done so. At the hearing, the parties discussed with the Court the possibility of holding a document inspection at the BLM Burns District Office. After further discussions, the parties have agreed to forgo that inspection.
>
> Instead, Defendant will produce to Plaintiff's counsel by 1/31/25 the following documents and stored information not previously produced to Plaintiff: all documents and stored information: (a) relating to the boundary (fencing, cattle guards) between what is now the BLM Mann Lake and the BLM Pollock grazing allotments; (b) relating to the cattle guard and related fencing to the south on East Steens Road (identified by BLM as in T33S, R35E, Section 6) (also called by the BLM the Alvord Reseeding Cattleguard), and any past or present cattle guard on East Steens Road and related fencing to the north of the Alvord Reseeding Cattleguard and south of the cattle guard at the accident site; and/or (c) relating to

**Page 7        UNITED STATES' RESPONSE TO PLAINTIFF'S MOTION FOR RULE 37 SANCTIONS**

any decision not to inspect, maintain, and/or plan for East Steens Road on federally-owned land.

Defendant will notify Plaintiff in writing when it has determined there are no further responsive documents or stored information found after diligent inquiry.

*Id.*, at 2.

The next day, January 28, 2025, the Court entered an order on the docket construing the stipulated proposed order as "a motion to extend discovery and pretrial deadlines." ECF 102. The Court ordered a modification of the parties' deadlines. *Id*. The Court made no mention of Plaintiff's motion to compel, an inspection of the Burns District Office, or the parties' reported agreement. *Id*.

***The United States' subsequent supplemental productions between January 15, 202,5 and May 2026***. Following the parties' January 27, 2025, agreement, the United States made six supplemental productions to Plaintiff. Plaintiff did not seek further aid of the Court regarding discovery.

The United States made a supplemental production on March 13, 2026, when it produced the expert report of Amalia Baldwin as well as the materials supporting her report. Among the supporting materials was HRA005047, a picture of the same 1935 Metsker Map that the United States subsequently produced on May 27, 2026—albeit without annotations. *See* Kilcup Decl., Exhibit C.

***The United States' May 27, 2026, supplemental production***. On May 14, 2026, while preparing its Motions in Limine, counsel for the United States requested assistance from agency counsel regarding any additional documentation that Harney County was maintaining the East Steens Road between 1968 and 1976. Agency counsel forwarded the request to several BLM employees, including Steven Boyer, who forwarded the request to additional BLM employees, including an employee, Joseph Mannix, from BLM's Cadastral Survey program. Boyer Decl. ¶ 4.

**Page 8**    **UNITED STATES' RESPONSE TO PLAINTIFF'S MOTION FOR RULE 37 SANCTIONS**

On May 18, 2026, that employee in turn forwarded the request to Markell Hamm, another Cadastral Survey program employee. Hamm Decl. ¶ 5. Markell Hamm was aware that Cadastral had a private shared drive that contained digitized copies of historic Metsker maps from across Oregon. *Id.* ¶ 6. Hamm reviewed that folder to see if there were maps that covered the relevant portions of East Steens Road. *Id.* ¶ 7. That same day, Hamm found four maps in the general area, including one with annotations that appear to refer to the cattle guard. *Id.* He forwarded those maps to agency counsel, who in turn forwarded those maps to counsel for the United States.

Upon its receipt of Hamm's email on Monday, May 18, 2026, counsel for the United States became aware of a potentially relevant map of East Steens Road in BLM custody that had not previously been produced. The map forwarded by Hamm was a Metsker map of Township 31 S., Range 35 E.W. in Harney County, Oregon, from 1935.[2] In Section 29 of the map, it depicts the Summit Creek Drift Fence, which an unknown source labeled as "1." and the Summit Creek Cattleguard, which presumably the same unknown source labeled as "2." In the top righthand corner of the map, there appears to be a key that reads: "1. Summit Cr. Drift Fence 50%-2-4-41" and "2. Summit Cr. Cattleguard 50% 2-27-42:



The map itself is from 1935, but beyond that, little is known about the map: there is no indication as to when the drift fence and cattleguard were drawn, who drew and labeled them, why

---

[2] For the sake of transparency, the United States also produced a copy of the same map that Markell Hamm, who provided the map, had annotated in red and whose annotations were not original to the map. ECF 160-1 at 2. In addition, the United States produced the cover page for the Metsker Atlas in which the map appears as well as the map for Township 31 S., Range 24 E.W. in Harney County, Oregon, from 1935.

**Page 9**       **UNITED STATES' RESPONSE TO PLAINTIFF'S MOTION FOR RULE 37 SANCTIONS**

they were included on the map, and what the percentages and identifying numbers mean.

Less than four business days later—during which the United States confirmed what the document was, and that it had not in fact been previously produced—the United States called Plaintiff's counsel to inform him of a forthcoming supplemental production.[3] During the call with Plaintiff's counsel, the United States explained that it had identified four digitized maps Metsker maps concerning East Steens Road, some with annotations that seem to address the cattle guard in dispute. Counsel for the United States represented that a folder within a private shared drive within BLM's Cadastral Survey program contained a total of 298 files, consisting of a cover page, an index, and 296 digitized Metsker maps for all of Harney County. Only one of those maps concerned the relevant portion of East Steens Road. Counsel for the United States offered to produce all of the maps in the folder or just the maps relevant to East Steens Road. The parties agreed the United States would produce all of the maps.

And on May 26, 2026, the United States produced the annotated map. And on May 28, 2026, the United States produced the remaining 292 files from the folder on the shared drive.

On June 1, 2026, Plaintiff moved for the imposition of sanctions against the United States. ECF 160.

## LEGAL STANDARD

Fed. R. Civ. P. 37(b)(2)(A) states that "if a party or a party's officer, director, or managing agent…fails to obey an order to provide or permit discovery…the court where the action is pending may issue further just orders. They include the following:

> (i)      Directing that the matters embraced in the order or other designated facts be taken as established for purposes of the actions, as the prevailing party claims;

---

[3] Counsel for the United States tried to contact counsel for Plaintiff by telephone on Friday, May 22, but was unable to reach counsel.

**Page 10**      **UNITED STATES' RESPONSE TO PLAINTIFF'S MOTION FOR RULE 37 SANCTIONS**

(ii)     Prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii)    Striking pleadings in whole or in part;

(iv)    Staying further proceedings until the order is obeyed;

(v)     Dismissing the action or proceeding in whole or in part;

(vi)    Rendering a default judgment against the disobedient party; or

(vii)   Treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

*Id*. To prevail on a motion for sanctions under Rule 37(b), the movant must show that the nonmovant violated a discovery order and acted in bad faith. *Phelps v. Wyeth, Inc.*, 857 F.Supp.2d 1114, 1127 (D. Or. 2012). A sanction under Rule 37(b)(2) must be "just" and must relate specifically to the particular claim at issue in the order to provide discovery. *Navellier v. Sletten*, 262 F.3d 923, 947 (9th Cir. 2001). When a sanction results in the dismissal of a claim, a district court must explicitly consider "whether the claimed noncompliance involved willfulness, fault, or bad faith, and also to consider the availability of lesser sanctions" before imposing the sanction. *Ambrosetti v. Or. Cath. Press*, 151 F.4th 1211, 1219 (9th Cir. 2025) *quoting R&R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1247 (9th Cir. 2012). The Ninth Circuit utilizes a five-part test, with three-subparts to the fifth part, to determine whether a case-dispositive sanction under Rule 37(b)(2) is just: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007). Factor five involves consideration of three subparts: whether the court explicitly discussed alterative sanctions, whether it tried them, and whether it warned the recalcitrant part about the possibility of dismissal. *Valley Engineers Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998).

**Page 11**       **UNITED STATES' RESPONSE TO PLAINTIFF'S MOTION FOR RULE 37 SANCTIONS**

"[Circuit courts] review the district court's rulings concerning discovery, including the imposition of discovery sanctions, for abuse of discretion. But to the extent the imposition of sanctions turns on the resolution of an issue of law, review is de novo." *Ambrosetti*, 151 F.4th at 1218 (9th Cir. 2025) *quoting Goodman v. Staples The Off. Superstore, LLC*, 644 F.3d 817, 822 (9th Cir. 2011).

## ARGUMENT

### I.    The United States did not violate a discovery order of this Court.

Plaintiff seeks sanctions under Rule 37(b)(2)(A), which are predicated on the failure of a party "to obey an order to provide or permit discovery[.]" The United States did not violate an order from this Court. To create the appearance of such a violation, Plaintiff takes language from a submission filed by Plaintiff's counsel—ECF 101[4]—that describes a discovery agreement reached between the parties, and characterizes the parties' language as "this Court's January 27, 2025 Discovery Order." ECF 160 at 2. Plaintiff's motion in fact refers to that filing as "the Court's Discovery Order" five different times. *See id*. at 2, 7, 9. Plaintiff does so despite the fact that the language he relies on from ECF 101 as this Court's "order" does not reflect anything said by the Court and does not bear the Court's signature. Worse still, Plaintiff does so even though, in ECF 102, the Court expressly construed ECF 101 as a "motion" and proceeded to enter its actual "order." The Court's actual order in ECF 102 did not incorporate or reflect the language from ECF 101 that Plaintiff now calls this Court's Discovery Order.

The Court's actual orders are reflected in ECF 100, and the related transcript of the January 15, 2025, status conference, and in ECF 102—the Court's January 28, 2025, order. Beyond what the Court ordered in ECF 102, what was in fact ordered by the Court is reflected in the minute

---

[4] In full, Stipulated Proposed Form of Order Submitted re Discovery, signed by counsel for Plaintiff and the United States.

order of the status conference that took place on January 15, 2025—ECF 100—which incorporates by reference the transcript of the status conference. With respect to Plaintiff's motion to compel, the Court ordered, after an extensive colloquy with the parties: "So I'm going to direct the parties to confer on an order to address Mr. Corson's in-person access to the files that he has requested production of." *Id*. The United States did precisely that, as is confirmed in ECF 101, where the parties report the following:

> The Court directed counsel for Plaintiff and Defendant to confer further about details of discovery needed at this time, and **they have done so**. At the hearing, the parties discussed with the Court the possibility of holding a document inspection at the BLM Burns District Office. **After further discussions, the parties have agreed to forgo that inspection**.

(Emphases added). The United States complied with the Court's actual order and Plaintiff cannot claim, let alone show, otherwise

## II.     Plaintiff seeks an inappropriate remedy

Plaintiff's request that the Court enter a sanctions order directing that, for purpose of the Phase 1 trial, it be established as fact that the Defendant was involved in the installation of the subject cattleguard and that the subject cattleguard is federal property is a thinly veiled attempt to obtain the ultimate relief—default judgment against Defendant the United States.[5]

A terminating sanction, whether default judgment against a defendant or dismissal of a plaintiff's action, is very severe. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007). Where a sanction results in default, the sanctioned party's violations must be due to the "willfulness, bad faith, or fault" of the party. *Jorgensen v. Cassiday* 320 F.3d 906, 912 (9th Cir. 2003). Here, the terminating sanction is the ultimate disposition of the United

---

[5] Plaintiff also requests that it be established as fact that the United States was aware of the subject cattleguard no later than 1942. ECF 160 at 5. While no sanction is appropriate because Plaintiff has failed to establish that the United States violated any discovery order of this Court, the United States does not contest this fact.

**Page 13      UNITED STATES' RESPONSE TO PLAINTIFF'S MOTION FOR RULE 37 SANCTIONS**

States' jurisdictional defense—the topic of Phase 1 of trial.

Under the plain language of Rule 37(b)(2), any sanction ordered by the Court must be "just." The Ninth Circuit utilizes a five-part test, with three-subparts to the fifth part, to determine whether a terminating sanction under Rule 37(b)(2) is just: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. *Conn. Gen. Life Ins. Co*, 482 F.3d at 1096.

Plaintiff requests that the Court sanction the Defendant and that for purposes of the Phase 1 trial it be established as fact that the Defendant was aware of the subject cattleguard no later than 1942, the Defendant was involved in the installation of the subject cattleguard, and that the subject cattleguard is federal property or in the alternative prohibit the Defendant from disputing that the subject cattleguard was installed by the Defendant and is federal property. ECF 160 at 5. Under Plaintiff's framing of the legal and factual issues before the Court, his requested sanctions would obviate the purpose of the Phase 1 trial altogether and cannot be justified under a bad-faith analysis nor the five-factor test set forth by the Ninth Circuit.

In *Hester v. Vision Airlines*, 687 F.3d 1162, 1167 (9th Cir. 2012), in consideration of the five-factors, the Ninth Circuit found that the Court's interest in managing its docket was best served by instituting sanctions because the Defendant's bad faith conduct had led to multiple hearings and motions before the court, which were necessary to address Defendant's misconduct. The court further held that the Defendant's conduct—repeated refusal to answer the plaintiff's request for production and refusal to comply with multiple court orders to show cause that included warnings that failure to comply may result in case-dispositive sanctions—could be construed as an attempt to prevent an accurate and fair trial on the merits of the case from occurring. *Id.* at

Page 14        UNITED STATES' RESPONSE TO PLAINTIFF'S MOTION FOR RULE
                   37 SANCTIONS

1170.

Plaintiff does not identify or expressly address the five factors above. However, the United States addresses the issues of bad faith and prejudice to Plaintiff below.[6]

### III.    The United States's discovery has been in good faith.

Even if the agreement between the parties reflected in ECF 101 were an order of this Court, the United States in fact abided by that agreement. It is clear from the transcript of the status conference on January 15, 2025, that the additional discovery contemplated by the Court and the United States was geographically focused on BLM's Burns District Office and conceptually focused on the seven categories of files outlined by counsel for the United States. At the January 15, 2025, status conference, the Court ordered the parties to confer regarding a process for Plaintiff's counsel to perform an in-person inspection of documents at the Burns District Office. Plaintiff's counsel ultimately declined that path. *See* ECF 101 at 2. Instead, the United States made additional documents available to Plaintiff through five supplemental productions between January 31, 2025, and April 15, 2025. Following those productions, Plaintiff did not seek additional relief from this Court.

Plaintiff nonetheless claims that the United States' recent production of an annotated Metsker map shows that the United States violated the parties' agreement. That is untrue and unfair. The annotated map produced by the United States in May 2026 was not located at the Burns District Office and was not within any of the seven categories of files identified by the United

---

[6] Also left unaddressed by Plaintiff is a potentially insuperable legal barrier to Plaintiff's requested relief: unlike in other contexts where the court may sanction a party by disposing of their claim, here Plaintiff asks the Court to make an ultimate disposition of the issue of its subject matter jurisdiction. But the Court's subject matter jurisdiction cannot be based on the actions of the parties, whether that action is agreement, waiver, or discovery misconduct. The Court is obligated, independent of the actions of the parties, to ensure it is adequately policing its subject matter jurisdiction. As such, if the Court's subject matter jurisdiction would rest on a legally dubious foundation if it proceeded based on the discovery failures of one of the parties.

**Page 15    UNITED STATES' RESPONSE TO PLAINTIFF'S MOTION FOR RULE 37 SANCTIONS**

States at the January 15, 2025, status conference. It was held on a private drive accessible to fewer than 10 people in BLM's Oregon/Washington Cadastral Survey program. The parties' agreement did not contemplate an exhaustive search through every private shared drive within every program, unit, and department within BLM—an agency with over 10,000 employees. Instead, the parties' agreement required the United States to "determine[] there are no further responsive documents or stored information … *after diligent inquiry*." ECF 101. The United States' further inquiry following the January 15, 2025, status conference was diligent. The existence of an annotated map in a private drive in an unexpected location does not show otherwise.

## IV.    Plaintiff has not been prejudiced.

Plaintiff claims that the United States' May 27 and 28, 2026, production of the Metsker maps is highly prejudicial because Plaintiff's "experts could not consider them when writing their reports" and Plaintiff was deprived "of the opportunity to depose a Defendant witness about these documents."  ECF 160 at 7.  To reach this conclusion, Plaintiff conjectures that "the most reasonable interpretation of the new maps produced . . .  is that the subject cattleguard was installed by the Defendant in or around 1942 in conjunction with the completion of the federal Summit Creek Drift Fence project."  *Id.* at 5.  Plaintiff's conjecture is both factually and logically unreasonable.

### A.  Plaintiff oversells the importance of the Metsker maps for his position.

Plaintiff characterizes the Metsker maps as if it is exculpatory *Brady* evidence in a criminal case.  In his opinion, the Metsker map proves that the United States installed the cattleguard and was therefore responsible for its maintenance.  But his interpretation of the maps is plainly contrary to the voluminous record evidence, including his own GIS expert's opinion.

Plaintiff's argument that the Metsker map shows the United States installed the cattleguard

Page 16        UNITED STATES' RESPONSE TO PLAINTIFF'S MOTION FOR RULE
               37 SANCTIONS

in 1942 relies on a number of unsupported assumptions. For starters, though no original documentation remains, the BLM file for the Summit Creek Drift Fence indicates it was completed in FY 1940. Tr. Ex. 501 at 58. Plaintiff asks the Court to disregard the validity of a project file BLM maintains in the regular course of business in favor of indecipherable pencil annotations by an unknown individual on an unknown date. If the Summit Creek Drift Fence was completed in 1940 like the BLM file indicates, that means whatever identifying number is associated with the fence on the annotated Metsker map cannot be the construction date. *Compare id.*, *with* ECF 160-2 at 2 ("Summit Cr. Drift Fence 50%-2-4-41"). Nor would it make sense that the annotation represents a construction date given the "50%" annotation after the labels for the Summit Creek Drift Fence and the Summit Creek Cattleguard. ECF 160-2 at 2. Plaintiff asks the Court to not question the percentage associated with the annotation and simply conclude that the numbers indicate a construction date. Compounding Plaintiff's attenuated argument is that he asks the Court to assume that because the cattleguard is depicted on a map that was in the BLM's possession, custody, or control, the cattleguard must be federal property. Not only is that finding inappropriate because it could be dispositive in finding the United States liable, but it is also plainly unfounded. Plaintiff's flawed reading of the one relevant Metsker map oversells the map's importance with respect to his case.

What's more, if Plaintiff's interpretation were adopted, it would belie his own expert's opinion. Mr. Steiner opines:

> Once the County Market Road was established in the 1920s, a clear primary route stabilized until the 1950s when the road underwent another period of transformation. Aerial imagery provides decisive evidence that between approximately 1953 and 1974, the primary route through Section 29 shifted multiple times, involving the construction of new road grades, the abandonment of earlier alignments, and the relocation or reconstruction of associated infrastructure, including the cattleguard at the Summit Creek Drift Fence.

**Page 17    UNITED STATES' RESPONSE TO PLAINTIFF'S MOTION FOR RULE 37 SANCTIONS**

Accordingly, from the spatial evidence alone, I conclude that the characterization of the present East Steens Road as a continuous extension of the County Market Road in Section 29 is not supported by the aerial imagery and historical maps. The current road was built and the associated cattleguard was installed approximately between 1959 and 1968 at a location that corresponds closely to the historic wagon road documented in early survey plats, while the County Market Road established in the 1920s followed a distinct and more easterly alignment associated with a specific period of regional infrastructure development linked to Alberson's Station.

Steiner Report at 20–21.

If the Steiner report is correct, then the road depicted in the 1935 Metsker map is undoubtedly a county road. See also Tr. Ex. 501. And if it was a county road, then Harney County was responsible for installing the cattleguard on the road. Furthermore, if Steiner is correct that current-day East Steens Road is more accurately aligned with a former path that the military traveled on versus the County Market Road, then the cattleguard on the Metsker map is not the same cattleguard as the accident cattleguard. The cattleguard would have been relocated from the County Market Road to the current alignment for East Steens Road. The BLM, which kept diligent records of cattleguard relocation, has no record of relocating the accident cattleguard. This further casts doubt that the Metsker map proves the cattleguard was installed and maintained by the BLM. In sum, the conclusion Plaintiff asks the Court to reach is plainly contradicted by record evidence, including Plaintiff's own expert's opinion.

### B. Any practical prejudice Plaintiff has suffered can be remedied without establishing a fact.

Plaintiff received the maps in question on May 27, 2026, almost three weeks before trial. Plaintiff's experts have had time to consider the maps and can supplement their opinions, both in writing or at trial. Indeed, Plaintiff's experts have not yet presented testimony in this case and are not prejudiced by having previously been deposed without the benefit of the maps. There are no impediments to Plaintiff's experts refining their opinions based on the Metsker maps. However,

Page 18        UNITED STATES' RESPONSE TO PLAINTIFF'S MOTION FOR RULE
                   37 SANCTIONS

if Plaintiff believes more discovery is necessary, the United States has not and will not oppose resetting the Phase 1 trial to allow Plaintiff to conduct discovery.  More prudent avenues exist that Plaintiff can pursue to remedy any alleged harm other than having the United States admitting liability.

DATED this 5th day of June 2026.

Respectfully submitted,

SCOTT E. BRADFORD
United States Attorney

*/s/ James A. Kilcup*
JAMES A. KILCUP
Assistant United States Attorney

*/s/ Ariana Garousi*
ARIANA GAROUSI
Assistant United States Attorney

Attorneys for the United States

**Page 19**    **UNITED STATES' RESPONSE TO PLAINTIFF'S MOTION FOR RULE 37 SANCTIONS**